**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**CHAD CORDELL,**

               **Plaintiff,**

**v.**
                                 **CIVIL ACTION NO.: 3:19-CV-47
(GROH)**

**ANDREW SAUL,**
**Commissioner of Social Security,**

               **Defendant**.

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

On April 4, 2019, Plaintiff Chad Cordell ("Plaintiff"), by counsel *pro se*, filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Andrew Saul, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1). On May 7, 2019, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 12; Admin. R., ECF No. 13). On September 3, 2019, and September 26, 2019, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 23; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 25). Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.   <u>PROCEDURAL HISTORY</u>

Plaintiff protectively filed his first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging continued after June 1, 2016. (R. 18).  Plaintiff was provided with a Notice of Disability Cessation on June 2, 2016. R. at 45. Plaintiff filed a written request for a hearing (R. 146), which was held before United States Administrative Law Judge ("ALJ") David Read on March 22, 2018 in Charleston, West Virginia. (R. 18).   Plaintiff proceeded pro se, and testified, as did Cecilia L. Thomas, an impartial vocational expert and Plaintiff's mother, Mary Keller. (<u>Id.</u>). On July 26, 2018, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 18-29). On February 8, 2019, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 7-9).

## III.   <u>BACKGROUND</u>

### A.   Personal History

Plaintiff was born on July 16, 1976, and was thirty-nine years old at the time that he was no longer considered disabled. He completed an GED program. (R. 78). Plaintiff's prior work experience included "maybe a couple days," in which Defendant provided the ALJ with paystubs. (R. 76). He was single at the time he filed his initial claim (<u>Id.</u>) and was single at the time of the administrative hearing. <u>Id.</u> Plaintiff alleged disability based on epilepsy/seizure disorder, intellectual disorder/learning disorder, degenerative disc disease of the lumbar spine, and obstructive sleep apnea. (R. 24).

B.     **Medical History**

1.  **Medical History Pre-Dating Alleged Onset Date of June 1, 2016**

In April 1991, Plaintiff underwent a psychoeducational evaluation conducted by Berkeley County Public Schools in order to determine eligibility for placement in a behavior disorder program. R. at 263. At the time of this evaluation, Plaintiff was an eighth grade student who was observed during multiple classes where it was noted that he distracted other students, was inattentive, fidgety, and "needed to be cued to tasks frequently." Id. at 263-64. Plaintiff was observed to have slow response times in regard to receiving instructions and while he willingly attempted all required tasks, it appeared he needed time to process what was expected of him. Id. at 264. Testing showed that Plaintiff was mildly mentally impaired in his cognitive ability. Id. Evaluation of Plaintiff's Social/Emotional Functioning showed that Plaintiff demonstrated "higher than average levels of aggression, anxiety, and depression." Id. at 265. The Evaluator noted that teachers indicated that he was "demonstrating significant difficulty developing and sustaining positive interpersonal relations." Id. The evaluator noted that Plaintiff qualified "for the behavior disorder program. Id. Additionally, "[Plaintiff's] medical condition was problematic in that he reported more frequent seizures than school personnel were aware of. Id. Behaviorally, [Plaintiff's] task performances, on task behaviors, task completion, and compliance were also reported to be problematic." Id.

On November 2, 2011, Plaintiff was seen by Kerry V. Bertschinger, D.C. for evaluation of his spine at which time an X-Ray was completed. R. at 55. The analysis of Plaintiff's x-rays revealed spinal stenosis at C3/C4 and C4/C5, hyperlordosis with posterior weight bearing of the lumbar spine, s-shaped scoliosis from T12 through L5, and a wedged vertebral disc at L4/L5 with decreased height posteriorly. Id.

On September 4, 2012, Plaintiff visited Dr. Christopher Murphy at University Health Physicians ("UHP"). R. at 48. Plaintiff told Dr. Murphy that "things continue to be 'completely overwhelming,'" but cannot describe what is overwhelming. Id. Plaintiff stated that he discontinued the use of Risperdal and does not have any more visual hallucinations. Id. Dr. Murphy noted that his issues with anger and anxiety continue, as he has been in two fights and has had some panic attacks. Id. Plaintiff reported that his paranoia towards his family has increased and believes that they are taking things from him, but then put his possessions back to make him think he is paranoid. Id. Dr. Murphy noted that Plaintiff later stated he has a "memory of a fish" and that he sometimes misplaces his possessions and that he blames others. Id. Plaintiff describes his sleep as "very bad" and that the 15 mg dose of Temazepam did not work after the first dose. Id. Dr. Murphy noted that Plaintiff made tangential statements about his brother, who is nine year younger than Plaintiff. Id. Dr. Murphy noted that Plaintiff "voices hopelessness" that his life can get better. Id. Plaintiff denies any overt suicidal or homicidal ideation. Id. Dr. Murphy discontinued Plaintiff's prescription of Temazepam, and instead prescribed Plaintiff with 100 mg  Seroquel to be taken at bedtime. Id. at 49. Dr. Murphy requested that Plaintiff return for a follow up visit four weeks later. Id.

On November 1, 2013, Plaintiff visited Dr. Christopher Murphy at UHP. Id. at 50. Dr. Murphy noted that Plaintiff reported improvement since he began to use Thorazine and noted that he is sometimes able to sleep without taking that medication. Id. Dr. Murphy noted that Plaintiff described feelings of paranoia, as he described an incident where gunshots were fired near his home and he believed the shots were intended for him, but Dr. Murphy noted that there was no evidence to support that claim. Id. Dr. Murphy continued Plaintiff on 10 mg of Chlorpromazine. Id. Plaintiff was instructed to continue on Phenytoin and Phenobarbital as

prescribed by Dr. Varga. Id. Dr. Murphy suggested that Plaintiff not consume alcohol and recommended a follow up visit in three to four weeks. Id.

On February 7, 2014, Plaintiff visited Dr. Christopher Murphy at UHP. Id. at 52. Plaintiff reported to Dr. Murphy that the Thorazine is helping him sleep but he feels sluggish in the morning. Id. Dr. Murphy noted that Plaintiff was not responding to internal stimuli but did verbalize paranoid ideations about others' motives. Id. Plaintiff complained that he experienced some pain and numbness in his left hand and arm, which he believed stemmed from his motorcycle accident a year earlier. Id. Plaintiff noted that he felt like he was being targeted by community police, but Dr. Murphy also noted that Plaintiff's insight and judgment seemed fair. Id. Dr. Murphy recommended that Plaintiff take 15 mg of Thorazine to treat his insomnia. Id. Plaintiff was instructed to try 10 mg of Ambien at bedtime should the Thorazine be ineffective or produce unacceptable side effects. Id. Dr. Murphy noted that Plaintiff had not followed up with Dr. Varga as requested. Id. A follow up visit in three to four weeks was recommended. Id.

On June 9, 2014, Plaintiff visited Dr. Christopher Murphy at UHP complaining of having side effects to the medication Concerta. R. at 53. Plaintiff reported taking the medication for two to three weeks. Id. Plaintiff believes that he was accidentally poisoned as his girlfriend felt similar symptoms. Id. Plaintiff reported going to the Emergency Department and Dr. Murphy noted that the emergency room doctor noted that Plaintiff was belligerent and agitated. Id. Dr. Murphy also noted that Plaintiff's toxicology screen was positive for marijuana and barbiturates, the latter of which are prescribed for Plaintiff's seizures. Id. Plaintiff left the Emergency Department before receiving further treatment "because [he] just felt agitated and wanted to get out of there." Id. Plaintiff did state that despite the side effects, the Concerta helped his attention span, concentration, and ability to stay on task and "it got [him] up and moving." Id. Plaintiff

denied suicidal or homicidal ideation but expressed paranoid ideation noting that he feels others might be following him or are out to harm him in some way. Id. Dr. Murphy noted that Plaintiff's affect was constricted, with limited reactivity, his speech was hyperverbal, and his thoughts were moderately circumstantial. Id. Dr. Murphy noted that it was difficult to redirect Plaintiff. Dr. Murphy also noted that Plaintiff's insight and judgment seemed a little limited. Id. Plaintiff was advised to resume taking the Concerta and to return to see Dr. Murphy in two to three weeks. Id. at 53-54.

On March 11, 2015, Plaintiff visited Panhandle Neurology Center, Inc. for follow up regarding his seizures. Id. at 312.  Dr. Varga reports that Plaintiff states he has not had any seizure activity since his last visit, that he has been compliant with all medications, and does not have any complaints of side effects of the medications. Id. Plaintiff reports that he does not drive or participate in dangerous activities. Id. Dr. Varga reports that Plaintiff's condition is stable at this time and that it is important for him to continue compliance with his medications and that he should follow up in six months. Id. at 314.

On September 14, 2015, Plaintiff was seen by Dr. Karoly Varga for a follow up of his seizures. Id. at 315. Dr. Varga notes that Plaintiff stated his last seizure was "years ago" and that he has been compliant with his medications, has had no side effects, and does not drive or partake in dangerous activities. Id. Dr. Varga reports that Plaintiff is not on a CPAP at this time for Obstructive Sleep Apnea because he could not tolerate it because it gave him seizures. but has had no symptoms besides heavy snoring. Id. at 317. Plaintiff was instructed to return in six months. Id.

On January 17, 2016, Plaintiff was admitted to the Emergency Department of WVU University Healthcare with complaints of acute onset of lower back pain. Id. at 280. Treating

Physician Dr. Muyderman noted that Plaintiff reported performing no activity that could have provoked his back pain. Plaintiff stated that he had been seated in his yard and upon standing, a sharp stabbing pain began in his lower back and radiated across his buttocks and down his legs. Id. Plaintiff further stated that he was able to make it into the house and after taking a nap the pain increased. Id. Plaintiff called EMS and was transported to the hospital by ambulance. Id. Plaintiff was given a muscle relaxer and nonsteroidal pain medication to facilitate reassessment. Id. at 283.

An MRI of Plaintiff's Lumbosacral Spine was taken and revealed mild disk bulges at L3/L4 and L4/L5 and irregularity of the associated endplates with some edema and mild enhancement. Id. at 285. Dr. Muyderman noted "no reports of any headache or visual disturbance, no ear drainage, no sore throat, no exertional chest pain or palpitations, no cough, no wheezing, no orthopnea, no abdominal pain, no nausea, no omitting. No saddle anesthesia, no incontinence of bowel or bladder, no extremity swelling and no definitive weakness. No rashes." Id. at 280. Overall, Dr. Muyderman reports no findings that would warrant admission to the hospital so Plaintiff was released with a prednisone taper and Valium with contact information for a neurosurgeon. Id. at 286. Plaintiff was informed that he may suffer from pre-hypertension/hypertension and was recommended to contact his primary care physician. Id. at 374.

An MRI Spine Lumbosacral Without and With IV Contrast. The scan rendered preliminary results: "there are mild disk bulges at L3-4 and L4-5. No spinal stenosis or NF narrowing. There is irregularity of the endplates of L4 and L5 with some edema and mild enhancement. The appearance does not seem much different from multiple prior CT and is likely inflammatory/degenerative. However, if there is suspicion for infection, follow up should be

obtained." Radiologist John Blanco, M.D. noted that L1-L2 was unremarkable; there was a slight disc bulge but no significant canal or neural foraminal compromise at L2-L3; and facet disease, small right foraminal protrusion, and mild right neural foraminal stenosis at L5-S1. Id. at 291-92. The doctor indicated that this scan "does not appear to be much different from multiple prior CT scans. It is likely inflammatory or degenerative; however, if there is any suspicion of infection, the radiologist did say further evaluation should be considered." Id. at 285. Plaintiff was observed walking from the stretcher to outside his room. Plaintiff was provided with information of neurosurgeon Dr. Yalamanchili but warned that Plaintiff may not be a surgical candidate.

On January 19, 2016, Plaintiff was admitted to Winchester Medical Center's Emergency room with complaints of back pain. Id. at 301. Plaintiff reported having tripped on a rock three days prior which caused him to fall. Id. Plaintiff further reported lower back pain with bilateral leg tingling since the fall and that he is barely able to walk due to right leg weakness. Id. Physical examination of Plaintiff revealed palpable spasm of the right lumbar paraspinal muscle but no spinal tenderness. Id. at 303. An X-ray of the Plaintiff's lumbar spine was taken and no fractures or malalignment of the lumbar spine was observed, however, degeneration is present at L4/L5 and L5/S1. Id. at 303-04. Plaintiff was diagnosed with an acute lumbar strain with spasm and he was advised on back exercises and stretches before being discharged. Id. at 304.

On March 17, 2016, Plaintiff was seen by Dr. Varga at Panhandle Neurology Center, Inc. for a follow up on his seizures. Id. at 318. Dr. Varga notes that Plaintiff reports no new seizure activity since his last visit, his condition is very well controlled, and Plaintiff is compliant with medication regimen. Id. Plaintiff reported his lower back pain to Dr. Varga and was referred to physical therapy with instructions to return in six months. Id. at 320.

On May 11, 2016, Plaintiff was seen for a mental status examination conducted by Dr. Harold D. Slaughter. Id. at 322. Dr. Slaughter noted that Plaintiff's chief complaints included allegations of epilepsy, sciatica, and ADHD. Id. Dr. Slaughter noted that Plaintiff denies panic attacks and suicidal ideation, but presents with depression, specifically noting Plaintiff's lack of interest in things, no hobbies, few friends, and Plaintiff's failure to engage in little or no society activities. Id. at 323. Dr. Slaughter noted that Plaintiff has received mental health treatment in the past, but is not currently seeking treatment. Id. The Mental Status Examination revealed that Plaintiff's attitude was cooperative but exhibited flat affect, his speech was low in tone and deliver quality, oriented in all spheres, his mood was depressed, his thought processes were within normal limits, thought content was coherent and relevant to topic, and his insight was within normal limits. Id. at 324. Additionally, Plaintiff's psychomotor behavior was within normal limits, judgment was noted as average based on clinical observation, his immediate memory was within normal limits (recalled 4 of 4 words), his recent memory was moderately deficient (recalled 2 of 4 words after delay), his remote memory was poor for detail and his concentration was average. Id. Dr. Slaughter noted that Plaintiff's concentration was average (digit span scaled score equal 8) and persistence within normal limits. Id. at 324. After examination, Dr. Slaughter diagnosed Plaintiff with unspecified depressive disorder, and unspecified personality disorder. Id.

### 2.  Medical History Post-Dating Alleged Onset Date of June 1, 2016

On August 30, 2016, Plaintiff was seen by physical therapist Brenda G. Allen for his lower back pain. Id. at 365. Plaintiff reported to Ms. Allen that he has been seen for his back pain at Berkley Medical Center several times but all they do is provide him with medicine before sending him home and that he has concerns about side effects of medication. Id. at 389. Ms.

Allen noted that Plaintiff has seen an orthopaedic specialist for his left hip pain and that a hip replacement was recommended. Id. Ms. Allen reported that Plaintiff has the most difficulty in shifting from sitting to standing and that he uses his arms to push himself upright signaling that his core is not providing enough stabilization to his lumbar spine. Id. at 365. Ms. Allen noted that Plaintiff is anticipating a referral to a new Neurologist in the coming months and that he will keep her advised. Id. at 365. Ms. Allen noted that Plaintiff may benefit from skilled physical therapy services including aquatic therapy. Id. Ms. Allen noted that Plaintiff will be seen twice a week for four weeks. Id. Plaintiff's treatment plan included therapeutic exercise, closed chain activities, aquatic therapy, modalities, manual therapy and/or therapeutic taping/neuromuscular re-education. Id.

Dr. Allen reported that Plaintiff has constant aching across both sides of his lower back; intermittent intense pain radiating into the left buttock and down his leg; and tingling in his feet. Id. at 390. Plaintiff reported that the symptoms have remained the same throughout the past month. Id. Dr. Allen noted that Plaintiff stands with decreased lumbar curve, scoliosis with thoracic convexity to the right; trunk flexion fingertips to superior patella with pulling across his lower back; "extension WFL without significant complaints"; and "side bending B WFL without significant complaints." Id. at 390. Dr. Allen noted that Plaintiff presented with chronic complaints of lower back pain with an exacerbation of LBP since 1/2016. Id. Dr. Allen noted that the onset of symptoms was mostly cumulative over time and Plaintiff was "unclear of any underlying pathology that may have been seen on diagnostic testing in the past." Id.

On August 31, 2016, Plaintiff was seen at Family Medical Associates in Martinsburg, West Virginia. Id. at 396. Plaintiff presented requesting a referral to a new Neurologist because

his previous Doctor left the Martinsburg area. Id. Plaintiff was referred to Dr. Zamora and instructed to continue his current medications. Id. at 397.

On January 24, 2017, Plaintiff was seen at Berkley Medical Center for a neurological initial consult for his seizures. Id. at 410. During this consult, Plaintiff declared that he is unsure of when he experienced his last seizure and that he believes he may be having some at night, but there is no one there to witness the seizures. Id. Plaintiff expressed that he has been on the same medication for years with no problems and does not wish to change medications. Id. Examination of Plaintiff showed normal memory, attention, and concentration as well as normal gait, coordination, muscle tone, and motor strength. Id. at 413-14. However, it is noted that Plaintiff's reflexes are diminished. Id. Plaintiff was instructed to continue medications and to update labs. Id. at 416.

On July 11, 2017, Plaintiff was seen by Dr. Garth B. Wright for a preoperative evaluation for Plaintiff's left hip arthroscopy. Id. at 463. Plaintiff expressed concern about the procedure, not being able to walk after surgery and requested only the hip arthroscopy and not the ITB band release. Id. Palpation of the left hip reveals palpable snapping and an MRI of the hip showed an anterior labral tear. Id. at 464. Possible courses of action were discussed with Plaintiff and the decision was made to proceed with a left arthroscopy with possible labral repair. Id.

On August 8, 2017, Plaintiff was seen by Dr. Garth B. Wright regarding a left hip arthroscopy performed on July 24, 2017. Id. at 453. Plaintiff presented using a cane and has been weight bearing as tolerated but it was noted that he was told he would be toe-touch weight-bearing and has been noncompliant. Id. Physical examination revealed that surgical incisions are healing well and x-rays performed in office show no signs of fracture subluxations. Id. at 454. During the appointment, Plaintiff was reeducated on the importance of toe-touch weight-bearing

11

only and instructed to use crutches. Id. Recovery plans for Plaintiff include water therapy and formal physical therapy and Plaintiff was instructed to return in four weeks. Id.

On August 16, 2017, Plaintiff visited UHP for a follow up regarding his seizures. Id. at 40. Plaintiff reports having a lot of anxiety and twitching in both legs; however, he does not know when he suffered his last seizure. Id. Plaintiff was instructed to return in three months. Id. at 41.

On September 5, 2017, Plaintiff saw Garth B. Wright, MD at University Orthopaedics and Sports Medicine. Id. at 451. Plaintiff was seen for a six week follow up on a left hip arthroscopy with pincer lesion removal and labral repair. Id. Dr. Wright notes that Plaintiff expresses discomfort in the lower left side of his back and that while he has been noncompliant with therapy, he has been doing aqua therapy on his own. Id. Examination revealed that the surgical incision is well healed, but that Plaintiff is experiencing tenderness to palpation in the left hip. Id. at 452. Plaintiff's left hip "showed no signs of erythema, effusions, or abrasions, and the left hip arthroscopy incision is well healed." Id. Plaintiff was instructed to attend supervised physical therapy and aquatic therapy and to return in six weeks for repeat evaluation. Id.

On October 31, 2017, Plaintiff was seen by Dr. Garth B. Wright for a post-operative visit and for complaints of sharp groin pain. Id. at 470-71. On November 29, 2017, Plaintiff was seen by nurse Theresa Triggs, at UHP Neurology regarding his seizures and back pain. Id. at 472-73. Plaintiff reported having some seizures since his last visit but is unsure of how many and Plaintiff was unable to clearly explain what is wrong with his back. Id. at 473. Plaintiff was instructed to follow up in six months. Id. at 473.

On November 29, 2017, Plaintiff was seen at WVU Medicine for a follow up on his seizures. Id. at 472. The medical records noted that Plaintiff had some seizures since the last

visit, but is unsure how many. The record also indicated that Plaintiff complained of back pain and that "it was very hard trying to get the pt to explain what that is wrong with him." The record noted that the seizures were "complex partial seizures evolving to generalized tonic-clonic seizures." Id. at 473.

On December 15, 2017, Plaintiff was seen at Berkeley Medical Center where a CT of his Pelvis With IV Contrast was performed. Id. at 481. Plaintiff was instructed to begin taking Colace twice daily, Vibramycin twice daily, and Percocet every six hours as needed for pain. Id. Plaintiff was instructed to return to the ER in two days for a wound re-check. Id. at 482.

On December 17, 2017, Plaintiff was seen at Berkeley Medical Center for a pilonidal cyst. Id. at 479. Plaintiff was instructed to take Voltaren twice daily and to follow up with a general surgeon. Id. at 479-80.

On May 30, 2018, Plaintiff visited UHP for a neurology follow up for his seizures. Id. at 38. Plaintiff reported that he did not know the last time that he had a seizure because Plaintiff reported that the seizures occur in his sleep. R. at 37-38.

On December 10, 2018, Plaintiff was seen by APRN Theresa J. Triggs for his seizures and back pain. Id. at 35. Plaintiff was instructed to keep taking his prescriptions, including Dilantin, and Phenobarbital. Id. Plaintiff was referred to UHP Pheumatology and advised to return in six months. Id.

### 3. Medical Reports/Opinions

#### a. *Disability Determination at the Initial Level*

On May 17, 2016, agency reviewer Atiya M. Lateef, M.D. reviewed Plaintiff's records and completed a physical residual functional capacity ("RFC") assessment. (R. 342-47). Reviewer Lateef found that Plaintiff had no exertional limits. Id. at 341. As to postural

limitations, Reviewer Lateef found that Plaintiff could frequently climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally balance; frequently stoop, kneel, crouch, and crawl. Id. at 342. It was also noted that Plaintiff should avoid unprotected climbing. Id. No manipulative, visual, or communicative limitations were found. Id. at 343-44. As to environmental limitations, Plaintiff could have unlimited exposure to wetness, humidity, noise, vibration, extreme cold and extreme heat, fumes, odors, dusts, gases, poor ventilations, etc. Plaintiff should avoid all exposure to hazards (machinery, heights, etc.). Id. at 344. Reviewer Lateef noted that Plaintiff had no problems caring for personal needs/hygiene, can prepare his own meals, performs light cleaning, occasionally drives despite his seizure disorder, shops for groceries, and [is capable of] handling [his] finances." Id. at 355. Dr. Lateef noted that Plaintiff's last seizure was "years" ago as of September 14, 2015 and is compliant with his medications and does not have any side effects. Id.

On May 17, 2016, agency reviewer G. David Allen, Ph.D. reviewed Plaintiff's records and completed a psychiatric review technique ("PRT") assessment. (R. 326). Dr. Allen found that Plaintiff had an impairment, unspecified depressive disorder, but it was not severe. (R. 329). Dr. Allen found no restriction of activities of daily living and mild difficulties in maintaining social functioning and concentration, persistence, or pace. Id. at 336. Dr. Allen also found no episodes of decompensation. Dr. Allen noted that his demeanor was cooperative, but Plaintiff's affect was extremely flat and he presented as generally lethargic. Plaintiff presented as "depressed, reports a lack of interest in things, has no hobbies and engages in little to no social activity." Id. at 338. Dr. Allen noted that Plaintiff had "no problems caring for his personal needs/hygiene, can cook, shops, can handle finances, occasionally drives, goes outside, does light cleaning, [and his] seizure medications affect his memory and ability to concentrate." Id. at

338. Dr. Allen noted that Plaintiff does not currently seek any psychiatric treatment and was observed to have no more than mild limitations as to his key functions. Id. Dr. Allen noted that the psychiatric aspect of Plaintiff's claim is non-severe for disability determination purposes. Id.

### b. *Disability Determination at the Reconsideration Level*

On April 3, 2017, agency reviewer Cindy Osborne, D.O., reviewed the prior RFC assessment. Dr. Osborne noted that Plaintiff can occasionally lift and/or carry 50 pounds; frequently lift and/or carry twenty-five pounds; can stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; unlimited ability to push and/or pull (including operation of hand and/or foot controls), other than as show for lift and/or carry. (R. 444). Dr. Osborne noted that Plaintiff can never climb a ladder, rope, or scaffolds. Id. at 445. Plaintiff demonstrated no manipulative, communicative, nor visual limitations. Id. at 447. Plaintiff can have unlimited exposure to extreme cold, heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gasses, and poor ventilation. Id. at 447. Plaintiff should avoid all exposure to hazards, including machinery and heights. Id.

On March 29, 2017, agency reviewer Karl G. Hursey, Ph.D. reviewed the prior PRT assessment and found that Plaintiff's impairment was not severe based on Plaintiff's allegations of Depressive, bipolar and related disorders and personality and impulse-control disorders. (R. 427). Dr. Hursey noted that there is insufficient evidence to substantiate the presence of the disorder. Id. at 430. Dr. Hursey noted that Plaintiff had a mild degree of limitation of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. Id. at 439. Dr. Hursey noted that there were reports of Plaintiff staying focused because of his prescriptions for his seizures.

Id. Plaintiff noted that he watches tv, can prepare meals, and performs some cleaning. Id. He also sleeps a lot due to the medications. Id. Plaintiff noted that he was afraid to drive because of his seizure and only shops every couple of weeks for approximately one to two hours. Id. Plaintiff noted that he can take care of his finances, get on social media, and spends time with his family. Id. Plaintiff noted that he can no longer play sports. Id. He has problems with his memory from the seizures and has difficulties following instructions. Id. He is extremely paranoid, does not trust people, and cannot handle stress. Id.

C.    **Testimonial Evidence**

At the ALJ hearing held on March 22, 2018, Plaintiff testified that he received his GED from the "James Rumsey Technical" in November 1994. Id. at 78. He testified that he used to receive A's and B's in school, but following his accident, he began receiving D's and F's. Id. He testified that he lives alone. Id. at 76.

Plaintiff testified that he has attempted to work but each attempt did not last more than a couple days. Id. at 76. These pay stubs were provided to the ALJ. Id. Plaintiff stated that he worked on movie sets on three different movies that were shooting in the area. Id. at 76-77.

Plaintiff further testified that he suffers from seizures and scoliosis in his back. Id. at 66. Plaintiff stated that he did not have any discs and "[i]t's all bone-on-bone at the bottom." He testified that his "polycyst" is new and that it is very painful to either sit or lay down. Id. Plaintiff testified that his hip, back, neck, and mind hurt. Id. at 66. Plaintiff testified that his scoliosis is in his back, that he doesn't have any discs, and "[i]t's all bone-on-bone at the bottom." Id. He stated that the polycyst was new and he had to go to the emergency room for it. Id.

At the hearing, Plaintiff testified that he had previously had an operation on his hip following a fall. Id. at 67. He stated that the operation did not make it better and he "think[s] it

made it kind of worse." Id. Plaintiff testified that walking, sitting, and standing causes his hip to hurt. Id. More specifically, there is "the burning, like a burning sensation, just all the way down my legs." Id. Plaintiff stated that he tries not to take medication, "but if it gets to a certain degree, yes, I take Oxycodone." Id. Plaintiff testified that he used to attend a chiropractor but cannot afford to go anymore. Id. at 69. He testified that the mixture of his medications does not go well together in his body. Id. at 68. Plaintiff testified that the bottom and the lower middle and sides hurt. Id.

Plaintiff's mother, Mary Cordell-Keller, also testified at the hearing. Ms. Cordell-Keller testified that she or another family member checks on Plaintiff every day. She testified that she can tell when Plaintiff has had a seizure because Plaintiff's "mouth is usually chewed up" and he stutters after he has had a seizure. Id. at 70. She also states that she can tell his mental state by the side of his neck and that that can sometime trigger his seizures. Id. When asked what makes Plaintiff unable to work, Ms. Cordell-Keller testified about his sleeping habits. Id. at 72. Plaintiff testified that Plaintiff does not sleep right. She testified that sometimes his mind is not very clear and the other physical issues that haven't really been disclosed. Id. Ms. Cordell-Keller testified that Plaintiff's hip surgery was done to take away the discomfort and that he would need both of his hips replaced eventually. Id. Ms. Cordell-Keller testified that he also has sleep apnea and his CPAP did not work. Id. Plaintiff testified that he used to have petit mal seizures and now has grand mal seizures. Id. at 74. She testified that his medication controls his seizures "to a degree, but he still experiences breakthroughs a good bit." Id. Moreover, Ms. Cordell-Keller testified that Plaintiff has scoliosis and has a cyst on the base of his spine. Id. Ms. Cordell-Keller testified that Plaintiff has had approximately 10 seizures in the last couple of years. Id. at 74. Ms. Cordell-

Keller further testified that as a result of the seizures, Plaintiff suffers from paranoia and anger.

Id. at 75.

## D.   Vocational Evidence

Also testifying at the hearing was Cecilia Thomas, a vocational expert.   Judge Read

stated that there was no past work to classify. R. at 79.   Judge Read presented the following

hypothetical:

> Here there's no past work to classify. Mr. Cordell is 41 years old. He does not
> have a GED. In the first hypothetical, I'd like you to assume an individual of the
> same age, education and work experience as the Claimant here.

(R. 79).

Incorporating the above hypothetical, the ALJ then questioned Ms. Thomas regarding

Plaintiff's ability to perform other work at varying exertional but unskilled levels.

> Q:   If the individual were capable of medium work, limited to no more than
> frequent climbing of ramps and stairs. No climbing of ladders, ropes or
> scaffolds. Frequent balancing, stooping, kneeling, crouching and crawling.
> No work at unprotected heights. Limited to simple, routine, repetitive
> tasks, not at a production-rate pace. Limited to simple work-related
> decisions and occasional interaction with the public.
>
> . . .
>
> Now, could an individual with that functional capacity—what work in the
> national economy could someone with that functional capacity perform?
>
> A:   Well, if we look at entry level, unskilled work, I think that would consider
> several occupational areas, Your Honor. I believe we could look at food-
> service related occupations, such as bus person and dining room
> attendants. Those number in excess of 160,000 nationally with a
> representative DOT of 311. 677-018, and that's a medium, SVP 2
> position. In terms of other medium occupations at an unskilled level, we
> would look at janitorial and cleaning occupations. Those number in excess
> of 1,500,00 nationally with a representative DOT of 381.687-018. And
> that's also a medium SVP 2 position. I would note one area of clarification
> n that type of work. The job I gave was just a janitor/night cleaner. When
> that was originally developed for the DOT, janitorial staff did things like
> change out lightbulbs and things like that; go up on a ladder occasionally.
> And these days we see that buildings have building maintenance type
> people that really are in charge of the physical facility maintenance. So, I

don't think that's really an issue in the current market. We could look at additional positions at a medium exertion, such as retail baggers, hand packagers. Those number in excess of 100,000 nationally with a representative DOT of 920.687-014. They're medium, unskilled. They're around public areas where people are passing through. They're not people that work in a direct service capacity. These days we don't even ask, paper or plastic. We're given the plastic. So, those would be representative examples at a medium level.

R. at 79-81.

Q:    If the individual had the same limitations as the first hypothetical but was further limited to the rang of light work, and the postural limitations further limited to occasional stooping kneeling, crouching and crawling. In terms of off task time, in this hypothetical they'd be off task less than 5% of the time in an eight-hour workday. Is there other work in the national economy that someone with that functional capacity could perform as well?

A:    I think there would be, Your Honor. Give me just a moment here. If we look at additional occupational areas at a light exertion, we could look at assembler occupations. For example, the cleaners, but they're categorized as maids and housekeeping cleaners. They number in excess of 500,000 nationally. Representative of that would be a room cleaner described at 323.687-014. And that's a light, SVP 2 position. We could look at mailroom clerk occupations, which are not postal positions. These are people who would work in a centralized location where mail, packages and so forth are delivered for opening and stamping and sorting and interdepartmental distribution. A representative DOT of 209.687-026. And that's a light, SVP 2 position.

Q:    And how many mailroom clerks were there in the nation?

A:    They're in excess of 100,000.

Q:    Okay.

A:    We might also look at things like office machine operator jobs. Those number in excess of 65,000 nationally with a representative DOT of 207.685-014, and that's a light, SVP 2 position.

Q:    Okay. And then in the last hypothetical, if the individual had the same limitations as hypothetical number two but was further limited, such that they would be off ask more than 15% of the time in an eight-hour workday, would that prevent the performance of other work?

19

A: Yes, sir. I think that would be work preclusive in terms of the performance issue.

Q: Has your testimony been consistent with the <u>Dictionary of Occupational Titles</u> today?

A: It has, except regarding the issue of the performance and off task time, and I base my responses in those areas on my experience in the public and private sector of rehabilitation services, over 35 years now dealing with individuals that are actually doing real-world type work, as well as review of the statistical information that's scattered through the Bureau of Labor Statistics.

R. at 81-3.

Plaintiff chose not to question Ms. Thomas when provided the chance. (R. 83).

**E.** **Report of Contact Forms or Disability Reports**

On August 20, 2016, a Disability Determination Report was completed. R. 201-15. Plaintiff noted that there were no new physical or mental conditions since his last report. R. at 201. Plaintiff noted that he was prescribed and taking Dilantin and Phenobarbital, which were prescribed by his neurologist. <u>Id.</u> at 204.

On November 24, 2017, a Disability Determination Report-Appeal was completed. R. at 219-20. Plaintiff noted that there were not changes in his medical conditions, but there were new medical conditions. Plaintiff noted that he "had a tear in my hip, required surgery, my mri pre-surgery shows my back is bone-on-bone and am in constant pain as well as scoliosis and epilepsy." R. at 222. Plaintiff noted that he does have future doctor's appointment's schedule and he is going to be seen for his physical, mental, emotional, and learning problems. <u>Id.</u> Plaintiff noted that there have been changes to his activities since last reported, noting that he is having a hard time with his dog and it is hard to walk. R. at 226.

F.      **Lifestyle Evidence**

On May 26, 2017, the Disability Hearing Officer filed her Report following a Disability Hearing. Linda Cavins noted that the impairment at the CPD was complex partial seizures which were occurring at night approximately two times per night and in October 2012, the seizures began occurring three times per month. R. at 120. Ms. Cavins noted that as of March 2016, the seizures were well controlled and that his last seizure was years ago. His MRI was normal. Id. at 121. Ms. Cavins noted that the seizures began when he was thirteen years old and began as petit mal seizures which progressed into grand mal seizures. Ms. Cavins noted that Plaintiff chews his tongue and inner jaw and that they occur two to three times a month. Plaintiff complained of bad migraines at night and that he tends to sleep for twenty hours at a time and his personality changes. Id. at 122. Plaintiff also describes his service animal, who is a two-year old puppy. Id. at 124. Plaintiff complained of "things going on in his mind." Plaintiff described that he forgets stuff and loses his phone. Id. Plaintiff stated that he does drive but worries about driving because of his seizures. Id. at 125. Plaintiff reported memory issues, complaining that he forgets what he wants to say and that he has problems sleeping. Id. at 130. Ms. Cavins found that Plaintiff's seizures were controlled with medication an his impairments do not meet or equal any listing. Id. at 136.

IV.      **THE FIVE-STEP EVALUATION PROCESS**

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the

national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following six-step sequential evaluation process to determine if a claimant continues to be disabled upon redetermination:

At step one, the undersigned must determine whether the claimant has an impairment or combination of impairments which meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CRF 416.920(d), 416.925 and 416.926). If the claimant does, his disability continues (20 CFR 416.994(b)(5)(i)).20 C.F.R. §§ 404.1520; 416.920 (2011).

At step two, the undersigned must determine whether medical improvement has occurred (20 CFR 416.994(b)(5)(ii)). Medical improvement is any decrease in medical severity of the impairment(s) as established by improvement in symptoms, signs and/or laboratory findings (20 CFR 416.994(b)(l)(i)). If medical improvement has occurred, the analysis proceeds to the third step. If not, the analysis proceeds to the fourth step.

At step three, the undersigned must determine whether medical improvement is related to the ability to work (20 CFR 416.994(b)(5)(iii)). Medical improvement is related to the ability to work if it results in an increase in the claimant's capacity to perform basic work activities (20 CFR 416.994(b)(l )(iii)). If it does, the analysis proceeds to the fifth step. At step four, the undersigned must determine if an exception to medical improvement applies (20 CFR 416.994(b)(5)(iv)). There are two groups of exceptions (20 CFR 416.994(b)(3) and(b)(4)). If one of the first group exceptions applies, the analysis proceeds to the next step. If one of the second group exceptions applies, the claimant's disability ends. If none apply, the claimant's disability continues.

At step five, the undersigned must determine whether all the claimant's current impairments in combination are severe (20 CFR 416.994(b)(5)(v)). If all current impairments in combination do not significantly limit the claimant's ability to do basic work activities, the claimant is no longer disabled. If they do, the analysis proceeds to the next step.

At step six, the undersigned must assess the claimant's residual functional capacity based on the current impairments and determine if he can perform past relevant work (20 CFR416.994(b)(5)(vi)). If the claimant has the capacity to perform past relevant work, his disability has ended. If not, the analysis proceeds to the last step.

At the last step, the undersigned must determine whether other work exists that the claimant can perform, given his residual functional capacity and considering his age, education, and past work experience (20 CFR 416.994(b)(5)(vii)). If the claimant can perform other work, he is no longer disabled. If the claimant cannot perform other work, his disability continues. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience.

## V.     ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the

following findings:

1. **The most recent favorable medical decision finding that the claimant was disabled is the decision dated December 21, 2012. This is known as the "comparison point decision" or CPD.**
2. **At the time of the CPD, the claimant had the following medically determinable impairments: seizure disorder/epilepsy with grand mal seizures, obstructive sleep apnea, and traumatic brain injury. This impairment was found to meet section(s) 11.03 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d)).**
3. **The medical evidence established that, since June 1, 2016, the claimant has had the following medically determinable impairments: epilepsy/seizure disorder, intellectual disorder/learning disorder, degenerative disc disease of the lumbar spine, and sleep apnea. These are the claimant's current impairments.**
4. **Since June 1, 2016, the claimant has not had an impairment or combination of impairments which meets or medically equals the severity of an impairment listed on 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).**
5. **Medical improvement occurred on June 1, 2016 (20 CFR 416.994(b)(1)(i)).**
6. **The medical improvement is related to the ability to work because, by June 1, 2016, the claimant's CPD impairment(s) no longer met or medically equaled the same listing(s) that was met at the time of the CPD (20 CFR 416.994(b)(2)(iv)(A)).**
7. **Since June 1, 2016, the claimant has continued to have a severe impairment or combination of impairments (20 CFR 416.994(b)(5)(v)).**
8. **Since June 1, 2016, based on the current impairments, the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can never climb ladders,**

ropes, or scaffolds or work at unprotected heights. He can
occasionally stoop, kneel, crouch, and crawl. He can frequently climb
ramps and stairs and balance. He can perform simple, routine, and
repetitive tasks, but not at a production rate pace (e.g. assembly line
work). He can make simple work-related decisions and have only
occasional contact with the public. In addition, the claimant would be
off-task less than (5%) of the regular workday.

9.     The claimant has no past relevant work (20 CFR 416.965).

10.    On June 1, 2016, the claimant was a younger individual age 18-49 (20
       CFR 416.963).

11.    The claimant has at least a high school education and is able to
       communicate in English (20 CFR 416.964).

12.    Transferability of job skills is not an issue because the claimant does
       not have past relevant work (20 CFR 416.968).

13.    Since June 1, 2016, considering the claimant's age, education, work
       experience, and residual functional capacity based on the current
       impairments, the claimant has been able to perform a significant
       number of jobs in the national economy (20 CFR 416.960(c) and
       416.966).

14.    The claimant's disability ended on June 1, 2016, and the claimant has
       not become disabled again since that date (20 CFR 416.994(b)(5)(vii)).

(R. 18-29).

## VI.     DISCUSSION

### A.     Standard of Review

In reviewing an administrative finding of no disability, the scope of review is limited to
determining whether "the findings of the Secretary are supported by substantial evidence and
whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).
Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a
conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co.
v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated
that substantial evidence "consists of more than a mere scintilla of evidence but may be
somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury
verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739
F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).

However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

"[Reviewing] courts are not to try the case de novo. At the same time, they must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951); Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964).

As such, "[reviewing courts] do not reflexively rubber-stamp an ALJ's findings." Lewis v. Berryhill, 858 F.3d 858, 870 (4th Cir. 2017). There are some things an ALJ must do in reaching and explaining his decision. An ALJ has a basic duty of explanation; his decision must be sufficiently explained to permit a court to meaningfully review it. Radford v. Colvin, 734 F.3d 288, 295-95 (4th Cir. 2013). An ALJ must also "explicitly indicate[] the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984). An ALJ must provide an "accurate and logical bridge" from the evidence to his conclusion. Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016). There are also some things an ALJ may not do in reaching a decision. An ALJ may not selectively "cherrypick facts that support [his decision] while ignoring relevant evidence [to the contrary]." Lewis, 858 F.3d at 869. Moreover, while an ALJ is not required to discuss every piece of evidence, Reid v. Commissioner, 769 F.3d 861, 865 (4th Cir. 2014), an ALJ excludes relevant evidence at his peril.

In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**B.    Contention of the Parties**

Plaintiff, in his Motion for Summary Judgment, asserts that the Commissioner's decision "is based upon an error of law and is not supported by substantial evidence." (Pl.'s Mot. at 1). Specifically, Plaintiff alleges that:

1.    The ALJ erred by failing to adequately develop the record due to a failure to obtain evidence critical to the proper evaluation of the Plaintiff's claim.

2.    The ALJ failed to account for all of the Plaintiff's limitations in the RFC finding.

3.    The ALJ's analysis fails to recognize and evaluate evidence supportive of the Plaintiff's symptoms.

4.    The ALJ's analysis of whether Plaintiff meets or equals Listing 11.02(C) is inadequate.

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 3-4, ECF No. 24). Plaintiff asks the Court to reverse the Commission's decision and award benefits, or "remand this case to the Commissioner for a new decision." Id. at 9.

Defendant, in his Brief in Support of Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1). Specifically, Defendant alleges that:

1. The ALJ had sufficient evidence to make a disability determination.

2. The ALJ's RFC finding is supported by substantial evidence and permits meaningful judicial review.

3. Substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not entirely supported by the record.

4. The ALJ sufficiently evaluated Listing 11.02C.

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 7, 10, 11, 14, ECF No. 26).

**C.     Analysis of the Administrative Law Judge's Decision**

**1.   The ALJ had an affirmative duty to obtain medical records when the medical records provided by Plaintiff were insufficient.**

A plaintiff "has a right to appear before the administrative law judge to present evidence and state his or her position." 20 CFR § 416.1450(a). Plaintiffs are entitled to such hearings that are full and fair. Sims v. Harris, 631 F.2d 26 (4th Cir. 1980). A plaintiff may be represented during these hearings, however, does not have an absolute right to be represented by counsel during the pendency of the plaintiff's case. Duggan v. Barnhart, 66 F App'x 730 (9th Cir. 2003); Cornett v. Astrue, 261 F. App'x 644 (5th Cir. 2008); Russell v. Chater, 62 F.3d 1421 (8th Cir. 1995); Slavin v. Commissioner, 932 F.2d 598 (7th Cir. 1991.) Furthermore, an ALJ has a duty to explore all relevant facts and inquire into issues necessary for adequate development of the record and cannot rely on the evidence submitted by the claimant when that evidence is inadequate." Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986). In *pro se* cases, ALJs have "a duty to assume a more active role in helping claimants develop the record." Id. The ALJ is permitted to question witnesses, request evidence, and subpoena witnesses. 20 C.F.R. §§ 404.944, 404.950(d). Furthermore, the ALJ may request that claimant obtain medical evidence, even at the expense of the Social Security Administration's Office. Upon a showing that "absence of counsel created clear prejudice or unfairness to the claimant" and claimant did not have a full and fair hearing, remand is required. Id.

**a.   The ALJ had a duty to obtain the November 29, 2017 medical records.**

Plaintiff argued that the ALJ failed to obtain the full medical records from January 24, 2017, August 16, 2017, November 29, 2017, and May 30, 2018. During the hearing, the ALJ inquired into missing medical records:

ALJ:     Okay. All right. So, you want to proceed with the hearing today. Now, you said that you think there are some medical records I don't have. What medical records would those be?

CLMT:    WVU Neurology. I have some emergency room records. After I had my surgery on my hip, I got a cyst – I have a cyst on my tailbone that they want to take out surgically, but I haven't gone to a surgeon or anything. I've already had one person stick his hands in me. I don't think I want to have any more surgeries.

ALJ:     Okay. For the WVU neurology, when did you go there?

CLMT:    This is – May 30th. Oh, no, that's my next appointment. November 29th, January 24th, October 31, 2017.

ALJ:     Okay.

CLMT:    I was in the emergency room on 12/15.

ALJ:     Okay. All right. So, we have some records from WVU Neurology up to about a year ago, so it sounds like you're saying you have some appointments from the same place since then, is that right?

CLMT:    Yes. If you have these records.

ALJ:     Well, we have some of the older ones. The last time you went to WVU Neurology was a few months ago or more than a year ago?

CLMT:    Just a few months ago.

. . .

ALJ:      All right. And then you said there are also some emergency room records from somewhere?

CLMT:    Yes.

ALJ:      What emergency room was that?

CLMT:    WVU Medicine. WVU – Berkeley Medical Center, ER.

ALJ:      And when did you go there?

CLMT:     On December 15th and December 17th.

ALJ: Okay. Okay. So, after the hearing, I will want to get those. Now, if you're able to request those yourself, you can do that. If you feel like you need us to be able to do that, we can ask for the records from here.

CLMT:     I have them.

ALJ:      Oh, you already have them?

CLMT:     Yes.

However, the medical records for November 29, 2017 were provided during the hearing were only discharge records. These records included two pages of an overview of the

appointment and discharge instructions for Plaintiff. The ALJ is required to obtain supplemental medical records when the medical records provided by Plaintiff were inadequate to make a medical determination. However, the undersigned finds that the ALJ's failure to obtain the entirety of the records for each visit was not harmless error. Morgan v. Barnhart, 142 Fed App'x 716; Bishop v. Barnhart, 78 Fed. App'x 265. While the discharge records provided to the ALJ describe the key important points of the appointment, including the impression; follow up recommendations, including prescriptions for Plaintiff to continue; and relevant orders; there was also information contained in the actual medical records that indicated that Plaintiff was having multiple nocturnal seizures and that these seizures had evolved into generalized tonic-clonic seizures. The August 16, 2017 medical records provided by the Plaintiff are also discharge records. These records differ from the November 29, 2017 records, as the August records do not provide pertinent information that could change the outcome of the ALJ's decision. While the undersigned finds that the entirety of the November 29, 2017 medical records should have been obtained, the undersigned believes the ALJ's failure to obtain the August 16, 2017 medical records is harmless error.

The other medical records that Plaintiff discussed were October 31, 2017, December 15, 2017, and December 17, 2017. The October 31, 2017 medical records contained in the Record seem to be the entirety of the medical records for that appointment and not just discharge papers. The December 15 and 17, 2017 medical records seem to be discharge papers, however, they are unrelated to Plaintiff's seizures and the undersigned does not believe that this information is pertinent to Plaintiff's seizures.[1] Accordingly, the undersigned **FINDS** that the ALJ had an affirmative duty to obtain medical records for a pro se party when the medical records provided were inadequate.

---

[1] Plaintiff also does not raise any issue to these medical records, specifically.

**b. The May 30, 2018 medical records are new and remand to include these records should be granted.**

Plaintiff also argued that the August 16, 2017 and the May 30, 2018 medical records should have be considered in his analysis. Defendant argued that these medical records are not new and thus remand should not be granted because Plaintiff has not shown good cause as to why these documents were not provided to the ALJ. 42 U.S.C. § 405 (g) states that " [t]he Court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior hearing." New evidence presented to this Court may permit a remand of the case when the following four conditions are met: (1) the new evidence is relevant to the disability determination and is not cumulative; (2) the new evidence is material, in that the Commissioner's decision could have been different when considering the new evidence; (3) there exists good cause for failure to present the evidence previously; and (4) a general showing of the nature of the new evidence. Borders v. Heckler, 777 F.2d 954 (4th Cir. 1985); see also Finney v. Colvin, 637 Fed. Appx. 711, 715-716 (4th Cir. 2016) (citing Borders despite its supersession by Wilkins v. Dep't of Health & Human Servs., 925 F.2d 769 (4th Cir. 1991)).

Here, the new evidence presented to this Court are Plaintiff's medical records from May 30, 2018. ECF No. 24-3.  The ALJ was put on notice that Plaintiff had a May 2018 appointment during the March 2018 hearing. The ALJ made no effort to obtain these records. These records also detailed that Plaintiff is complaining of seizures that occur in his sleep, he is unable to determine the last seizure, but had been adhering to his prescribed medication Dilantin and phenobarbital. The ALJ had an affirmative duty to obtain the medical records and was sufficiently notified of their existence. The ALJ made no effort to instruct Plaintiff to obtain the

30

records either. Unlike the August 16, 2017 medical records, these records provide information

that Plaintiff has been suffering from seizures in his sleep since the last appointment. Moreover,

the medical records further indicate that the medical professionals believe the seizures to be

complex partial seizures evolving to generalized tonic-clonic seizures. The undersigned believes

these medicals records are material as they pertain to the severity of the seizures and there is

good cause for Plaintiff's failure to provide the records to the ALJ.

## 2. The ALJ did not consider the entirety of the Record at the first step when considering whether Plaintiff met the 11.02 Listing

There is a seven step process by which a claimant's disability is redetermined. First, the

ALJ "must determined whether the claimant has an impairment or combination of impairments

meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P,

Appendix 1 . . . . If the claimant does, his disability continues. Step two, then requires a

determination of whether a medical improvement occurred. This requires an analysis of whether

is was "any decrease in medical severity of the impairment(s) as established by improvement in

symptoms, signs and/or laboratory findings."

The ALJ cited Listing 11.02 which states that:

In order to meet or medically equal the criteria of Listing 11.02, the claimant must show epilepsy documented by a detailed description of a typical seizure and characterized by:

A. Generalized tonic-clonic seizures, occurring at least once a month for at least three consecutive months despite adherence to prescribed treatment.
   OR
B. Dyscognitive seizures, occurring at least one a week for at least three consecutive months despite adhere to prescribed treatment.
   OR
C. Generalized tonic-clonic seizures, occurring at least once every 2 months for at least four consecutive months despite adherence to prescribed treatment; and a marked limited in one of the following:
   1. Physical functioning; or

        2.      Understanding, remembering, or applying information; or
        3.      Interacting with others; or
        4.      Concentrating, persisting, or maintaining pace; or
        5.      Adapting or managing oneself.
    OR
D.    Dyscognitive seizures, occurring at least once every 2 weeks for at least three consecutive months despite adherence to prescribed treatment; and a marked limitation in one of the following:
        1.      Physical functioning; or
        2.      Understanding, remembering, or applying information; or
        3.      Interacting with others; or
        4.      Concentrating, persisting, or maintaining pace; or
        5.      Adapting or managing oneself.

R. at 21.

When evaluating whether epilepsy meets the Listing requirement, "both medical and non-medical evidence" is used "to assess the effects of [an individual's] neurological disorder." 20 CFR Part 404, Subpart P, Appendix 1, Listing 11.00(B)(1). Medical evidence includes, patient's medical history, examination findings, laboratory results, and X-Ray, MRI, CT, and EEG results. Id. "'Adherence to prescribed medication' means that [the individual has] taken medication(s) or followed other treatment procedures for [the] neurological disorder(s) as prescribed by a physical for three consecutive months but [the] impairment continues to meet the other listing requirements despite this treatment." Id.

The ALJ specifically noted that "[s]ince June 1, 2016, the claimant has not had an impairment or combination of impairments which meets or medically equals the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1." The ALJ made the determination that Plaintiff has had one seizure on Christmas Eve 2017 and that Plaintiff did not present any objective medical evidence that he has had a seizure or seizure activity since at least June 1, 2016. The ALJ's decision on Step One, however is based on the testimony of Plaintiff that his

last seizure was on Christmas Eve 2017 and that the hearing officer on May 26, 2017 noted that Plaintiff has not had a seizure in years.

The ALJ, however, did not have the entirety of Plaintiff's medical records. As discussed above, the ALJ had an affirmative duty to take an active role in the investigatory process during the ALJ's determination when a party is proceeding pro se. Plaintiff did provide medical evidence that provided that Plaintiff had been experiencing seizures since his hip surgery in 2017. Specifically, the ALJ was provided the medical records from January 24, 2017, which identified that Plaintiff was suffering from seizures during the night and the October 31, 2017 records, which Plaintiff admitted to having seizures since his last visit but was unable to determine how many. Plaintiff provided the ALJ with November 29, 2017 discharge records, which detailed his follow up visit for his seizures because he had begun having seizures since his last visit and that he is compliant with his medication. Plaintiff also noted that he had a seizure on Christmas Eve, 2017 which was discussed in detail on the Record during the hearing.

 Furthermore, the medical records which should have been obtained from the May 30, 2018 doctor's appointment, which indicated that Plaintiff had be suffering from seizures in his sleep. While the ALJ could again find that Plaintiff does not meet the severity of the listing under 11.02, the ALJ should have at least consider the medical records provided determined whether Plaintiff's impairment meets the Listing requirement under 11.02.

The undersigned is of the opinion that the ALJ did not incorporate or consider Plaintiff's medical history and records when making this determination. The ALJ was required when drafting his opinion to give a detailed explanation for his reasoning. The ALJ simply provided that he considered the Plaintiff's testimony that his last seizure was Christmas Eve 2017 and a statement made during a disability hearing. However, the ALJ does not state whether the medical

records from January 24, 2017 to May 30, 2018 were considered in this determination. The undersigned is unable to meaningful review whether these medical records were considered. In fact, the undersigned finds that throughout the entirety of the opinion, there was only a specific discussion that Plaintiff reported that he did not remember the last time he had a seizure as of January 2017. Because the ALJ is reviewing whether Plaintiff had an impairment that meets the listing under 11.02 since June 1, 2016, all of Plaintiff's medical records should be considered in this determination.

### 3.   The RFC failed to consider all of Plaintiff's limitations

There is no Fourth Circuit or Northern District of West Virginia authority that provides a standard which requires an ALJ to consider an individual's service animal in a person's RFC. However, other district courts have determined that a service dog <u>must</u> be medically necessary to be considered in the individual's RFC. <u>Santos v. Colvin</u>, 2013 WL 5176848 (W.D. Wash. Sept. 12, 2013); <u>Payano v. Colvin</u>, 2017 WL 4778593 (D. Nev. Oct. 23, 2017). When there is evidence of prescription of the dog from a medical provider, the service animal must be considered in the individual's RFC. <u>Rentfro v. Colvin</u>, 2015 WL 12868081 (C.D. Ill Oct 21, 2015). Generally, a letter from a medical provider that suggests an individual's use of a service dog, without further testimony or documentation of the individual's need and use of the service animal, is insufficient to establish that the service dog is medically necessary. <u>Payano</u>, 2017 WL 4778593, at *4.

The determination of whether the ALJ should have inquired into Plaintiff's prescription and use of a service dog, and whether the RFC was based on substantial evidence without this information is so closely related to each other that both are examined in this section. Generally, the use of a service dog should be something that is examined by an ALJ. However, here, the ALJ was not notified that there was a service dog. There was no mention of the service animal at

the hearing by either Plaintiff nor the Plaintiff's mother. The only mention of the service animal in the Record provided by the social security administration is a handwritten note that stated that Plaintiff lived alone with his service dog, which was in the Disability Hearing Officer's Report of Disability dated May 25, 2017. R. at 124.

Plaintiff did, however, mention his dog at other points in the record, but never again referring to the animal as a service animal. R. at 226 ("Having a hard time with my dog. Hard to walk"). This was the only information that was provided to the ALJ when he rendered his opinion. The medical records from Plaintiff's treating physicians and testimony during the hearing are completely devoid of any mention of the dog, and to require the ALJ to inquire into matters outside of his knowledge. The undersigned **FINDS** that the ALJ did not have a duty to inquire into the use of a service animal because the ALJ did not know that the service dog existed nor did the ALJ's duty to investigate extend to matters of which he was not adequately informed.

Plaintiff then provided the Appeals Council with a letter authored by himself which indicated that he has an emotional support animal. None of this information alone provides the Appeals Counsel with enough reason to believe that Plaintiff has been prescribed a service animal. There is no prescription on the Record from a medical source. There is no testimony by Plaintiff or his mother than would indicate that Plaintiff required the use of this service animal. Nor was there any mention that Plaintiff required the service animal in order to work.

Furthermore, the ALJ does not need to consider the use of a service dog in Plaintiff's RFC as there has been no testimony regarding how much Plaintiff utilizes the service dog, whether Plaintiff has shown improvement with the dog, and whether Plaintiff requires the service dog to perform work. Rentfro v. Colvin, 2015 WL 12868081 (C.D. Ill. Oct. 21, 2015) (ALJ

failed to address the service dog when prescription order given to court, along with testimony and evidence of the plaitniff's use and need for the dog, and use of dog tied directly to impairments for which the plaintiff alleged he was disabled).

Furthermore, to date, Plaintiff has not provided the undersigned with medical records that indicate that Plaintiff has been prescribed a service animal. Plaintiff only provides a letter to a landlord that provided that Plaintiff has limitations which would require Plaintiff's service dog to to live with him pursuant to the Americans with Disabilities Act. The letter alone, absent any other information, is insufficient to require the service dog to be taken into consideration when determining Plaintiff's RFC. Accordingly, the undersigned **FINDS** that the ALJ did not err by failing to inquire into Plaintiff's service animal and the ALJ did not err by not considering the service dog in Plaintiff's RFC determination.

Finally, the undersigned does not find this information to be new. Plaintiff has failed to provide the reason why this information was not disclosed to the ALJ nor when given the opportunity to discuss his impairments, Plaintiff failed to discuss his service dog. Furthermore, in Plaintiff's pleadings, he fails to provide good cause as to this failure and even more telling is the fact that the pleadings are devoid of any information regarding his dog, including that he needs his service animal to work. Accordingly, the undersigned **FINDS** that the ALJ did not err by not considering Plaintiff's service dog in the RFC and that this information (including the letter to the landlord) is not new information that should require remand.

### 4. The ALJ's decision is not supported by substantial evidence

The ALJ specifically found that

Since June 1, 2016, based on the current impairments, the claimant has had the residual capacity to perform light work as defined in 20 CFR 416.967(b) except he can never climb ladders, ropes, or scaffolds or work at unprotected heights. He can occasionally stoop, kneel, crouch, and crawl. He can frequently climb ramps

and stairs and balance. He can perform simple, routine, and repetitive tasks, but not at a production rate pace (e.g. assembly line work). He can make simple work-related decisions and have only occasional contact with the public. In addition, the claimant would be off-ask less than five percent (5%) of the regular workday.

R. at 25.

Plaintiff argued that the ALJ's decision was not based on substantial evidence because the ALJ failed to evaluate Plaintiff's symptoms as required under the law. ECF No. 24, at 3. Plaintiff only challenges the ALJ's finding based on his seizures. "[A]n individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability. However, if an individual alleges impairment-related symptoms, [the social security administration] must evaluate those symptoms using a two-step process. The first consideration is "whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms.

The second consideration is, if there is an underlying physical impairment that could reasonably produce the individual's symptoms, the "intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." In considering the intensity, persistence, and limiting effects of an individual's symptoms, the ALJ will consider "1. Daily activities; 2. The location, duration, frequency, and intensity of pain or other symptoms; 3. Factors that precipitate and aggravate the symptoms; 4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; 5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; 6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 or 20 minutes every hour, or sleeping on a board); and 7. Any other

factors concerning an individual's functional limitations and restrictions due to pain or other symptoms." SSR 16-3P. However, if there is no information in the Record regarding one of the factors, the ALJ will not consider that factor. Id.

First, the ALJ determined that Plaintiff's medical impairments "could reasonably be expected to produce the alleged symptoms." The ALJ determined that Plaintiff had the following impairments: epilepsy, back pain, scoliosis, and left hip pain. Plaintiff does not object to this determination. However, the ALJ next finds that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the objective medical and other evidence for the reasons explained in this decision." R. at 25. The ALJ considered that Plaintiff has had seizures following a brain injury that occurred when he was a teenager. The ALJ noted Plaintiff's March 2015 doctor's appointment where he noted that no seizure activity occurred since his previous visit, but than an EEG was performed and resulted in abnormal result noting it was potentially epileptogenic. The ALJ noted that Plaintiff was permitted to driver following this doctor's appointment due to no seizure activity. The ALJ also considered Plaintiff's September 2015 doctor's appointment where his doctor noted no seizure activity. The ALJ also considered Plaintiff's March 2016 doctor's appointment which Plaintiff reported no seizure activity and the medication controls his seizure disorder.

However, the only doctor's appointment after June 1, 2016 that the ALJ considered was the appointment in January 2017, which Plaintiff reported that he believed he was having seizures at night and did not know when his last seizure was. His physical, mental, and neurological evaluation, however, was unremarkable. R. at 26. The ALJ did not consider the medical records of August 16, 2017, August 31, 2017, October 31, 2017, November 29, 2017, and May 30, 2018. Since the ALJ is considering the intensity, persistence, and functionally

limiting effects beginning in June 1, 2016, the ALJ should consider all the medical records after that date, as well.

### 5. The ALJ has misapplied the law when determining if the medical impairment was related to the ability to work

Pursuant to 20 CFR 416.994(b)(2)(iv)(A), if an ALJ finds that there is "[a] decrease in the severity of an impairment as measured by changes (improvement in symptoms, signs or laboratory findings) can, if great enough, result in an increase in the functional capacity to do work activities . . . When new evidence showing a change in symptoms, signs and laboratory findings establishes that *both* medical improvement has occurred *and* your functional capacity to perform basic work activities, or residual functional capacity, has increased, we say that  medical improvement which is related to your ability to do work has occurred." (emphasis added). The ALJ determined that Plaintiff did no longer met the same listing that was used to establish his disability on August 31, 2010. The ALJ found that using Listing 11.03, Plaintiff is not suffering from nonconvulsive epilepsy, including petit mal, psychomotor, or focal seizures, at least once weekly for three months.

The ALJ, however, specifically noted "[t]he medical improvement is related to the ability to work because, by June 1, 2016, the claimant's CPD impairment(s) no longer met or medically equaled the same listing(s) that was met at the time of the CPD. (20 CFR 416.994(b)(2)(iv)(A))." R. at 23. The ALJ has only cited a partial portion of the law when making this determination. The ALJ did not find that that there is an increase in Plaintiff's functional capacity to perform basic work activities. In fact, there is no mention there was an increase in Plaintiff's functional capacity at all nor that that was a part of the determination that the medical improvement was related to his work. Nowhere in the ALJ's opinion does he discuss Plaintiff's previous functional capacity to perform basic work activities nor does the undersigned currently have that

information readily available. Accordingly, the undersigned **FINDS** that the ALJ erred by misapplying the law when determining the medical improvement of Plaintiff was related to work.

## V. RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is not supported by substantial evidence. Accordingly, I **RECOMMEND** that

> Plaintiff's Motion for Summary Judgment (ECF No. 23) be **GRANTED IN PART** and **DENIED IN PART**, Defendant's Motion for Summary Judgment (ECF No. 25) be **GRANTED IN PART and DENIED IN PART**, and the decision of the Commissioner be vacated and this case be **REMANDED** pursuant to for further proceedings.

Any party shall have fourteen days from the date of filing this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140

(1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Additionally, as this report and recommendation concludes the referral from the District Court, the Clerk is further **DIRECTED** to terminate the magistrate judge's association with this case.

Respectfully submitted this November 4, 2019

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE